## ALFRED PORTER & another *vs.* MATTHEW SULLIVAN.

Accepting from the same grantor a deed of general warranty of upland bounding on the sea shore, and a deed of special warranty of the flats in front thereof, does not estop the grantee to claim title to the flats.

In an action by the proprietor of upland bounding on the sea, for trespassing upon flats above low water mark and within one hundred rods in front of the upland, an instruction, that, in the absence of evidence of any claim or conflicting right of any conterminous proprietor, the intervention of a bend in the channel will not defeat the plaintiff's claim to flats within the one hundred rods and on the same side of the channel as the upland, is immaterial and no ground of exception, if the channel does not intervene between the upland and the place of the trespass.

An action for entering upon the plaintiff's close is sustained by proof of a trespass upon any part of the close described.

In an action for trespassing upon flats, the expression by the judge to the jury of an opinion, that evidence of digging thereon more than thirty years before and occasionally since was somewhat slight to establish a usage to dig there, is no ground of exception.

The rights of the proprietors of upland in adjoining flats under the ordinance of 1647 were not affected by the subsequent establishment of town lines.

SHAW, C. J. This is an action of tort, in the nature of trespass *quare clausum*, to recover damages of the defendant for

entering upon the close of the plaintiffs, consisting of flats, near the junction of Bass River and Porter's River within the harbor of Salem, and digging and carrying away therefrom large quantities of mud with muscles mixed therein. The case comes before us upon exceptions to the rulings of the judge before whom it was tried in the court of common pleas, and has been argued in writing.

It appears that the premises are flats adjacent to and connected with a projecting point of land in Beverly, called Salter's, or Salter's Point, being a parcel of upland, around which there is a considerable expanse of flats, over which the sea ebbs and flows. The plaintiffs claim ten acres of upland, and the flats adjacent, under the devisees of Moses Green, who owned and occupied the estate at Salter's Point many years, and died in 1838, having made a valid will, giving his estate to his wife for life, with remainder to two sons and a daughter. One of these devisees died several years ago in California, after which the wife died; whereupon the other son and the daughter conveyed the estate in fee to the plaintiffs. This conveyance was made by two deeds, both dated the 15th of February 1855, and executed, acknowledged and delivered simultaneously; the one a deed of " a certain piece of land, consisting of upland, salt marsh and thatch ground, it being a part of the piece of land called Salter's," and bounded on one side on Salter's Cove, on another by Bass River and Porter's River, which are understood to be arms of the sea; the other a quitclaim deed of " all our right, title, interest and estate in and to all the flats ground adjoining the piece of land called Salter's, and also all our right and title in and to the great muscle bed lying on the southwesterly side of the said land called Salter's, with all the privileges and appurtenances appertaining to the same."

It is conceded that Moses Green, in his lifetime and at his decease, owned the upland around which the flats in question lie; and if so, the conclusion of law is, that he owned the flats lying in front of such upland to low water mark, if less than one hundred rods, or if the tide ebbs further, then to the extent of one hundred rods. It must be limited by low water mark, that

is, by a line from which the water does not ebb.    The mode of measuring is sometimes very difficult, in consequence of the conformation of the upland; it must be in front of the land, that is, directly to the sea from which the tide flows, by lines as nearly as practicable perpendicular to the line of shore, or the line of ordinary high water mark, meaning by this, not the line of high water at spring tides, but at ordinary tides.    It is obvious from this, that if the shore be convex, the flats attached to it, in proceeding seaward, will expand; if very prominent, the flats will be of a fanlike shape.    Each case must depend on its own circumstances; and many cases have been decided under various circumstances, with a view of coming as near as practicable to the rule prescribed in very general words in the ordinance of 1647, " that in all creeks, coves and other places about and upon salt water, where the sea ebbs and flows, the proprietor or the land adjoining shall have propriety to the low water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further."

The construction which has ever been put upon the colony ordinance of 1647 is, that it changed the rule of the common law in regard to the ownership of land lying between high and low water, if not exceeding one hundred rods, so as to give the owner an estate in fee in such flats land, subject only to such limited rights and easements as are reserved to the public in such flats, by the terms of the ordinance or the necessary implications therefrom.    To " have propriety," or property, was " to hold as owner," and no other tenure being named, it is construed as " tenant in fee."

One other remark it is proper to make.    All private property or ownership in land, within the limits of the Colony of Massachusetts, must be derived from a grant of the colonial government.    All the lands were first granted by the crown to the Governor and Company of the Massachusetts Bay in New England, and by them were parcelled out to individuals, and, at a later period, to bodies of proprietors, as tenants in common.

In 1628, before the governor and assistants had removed with the charter to America, an authority was delegated by them to

Governor Endicott and a special council, known as "the Gov-
ernor and Council of London's Plantation in the Massachusetts
Bay in New England," to come to Massachusetts, and make
grants of land to original subscribers for stock, and others enti-
tled to them; but this body had no authority, under such delega-
tion of power, to erect municipal or other corporations. Before
the arrival of Governor Winthrop and a majority of the assistants
with the charter in 1630, a great number of private grants had
been made by Governor Endicott and his special council; and as
these grantees would naturally desire to take their grants in prox-
imity with each other, for mutual defence, convenience and com-
fort, they thereby formed themselves into settlements or villages,
and the first step towards forming these settlements into corpora-
tions was to give them a name. One of the earliest acts of the
colonial government, after it was organized here in 1630, was to
levy a tax of £50 for the use of the colony, which was appor-
tioned amongst the settlements named, of which Naumkeag,
now Salem, was one. But these settlements had no fixed local
limits or boundaries; and it became necessary to fix such limits,
in order to ascertain what proprietors in particular should be
rated in any such assessment, and who should be subject to the
duties and entitled to the immunities of such village or settle-
ment. Of course, all the early records of the colony are filled
with acts prescribing the bounds of each township; but such
acts, intended solely to fix the limits of jurisdiction, are never
used as instruments for granting land. These settlements, first
named and then bounded, must of necessity have assessors, or
similar officers, to apportion and collect taxes levied; they were
also, by general acts, vested with power to choose other neces-
sary officers, and to manage their own prudential concerns, until
they grew to be *quasi* municipal corporations. And it is believed
that no act was passed, similar to modern acts of incorporation
of towns, until near the close of the colonial government, and
the establishment of a new government under the province
charter in 1692.

With these views of the early grants of land in Massachu-
setts, and the construction of the colony ordinance, we may

proceed to consider the title in question.   The estate in question, Salter's, or Salter's Point, was a place then, as now, lying upon a cove, creek or place where the tide ebbed and flowed. If it was granted out to any private proprietor before 1647, the ordinance, when it passed, *eo instanti* acted upon and extended it, as an estate in fee, over the flats.   If it had not then been granted, it remained the estate of the Colony, with the like right to flats; and when the government subsequently granted it to any private person, the flats passed with it.   In either case, the flats were annexed to the upland by force of the ordinance.

Now the construction put upon the ordinance always has been, that although the whole being an estate in fee, the owner may convey the upland without the flats, or the flats without the upland, *Mayhew* v. *Norton,* 17 Pick. 357 ; yet, in the absence of any proof of the alienation of the one without the other, the presumption of law is, that the title to the flats follows that of the upland on which they lie, and proof of title to the upland establishes a title to the flats.   *Valentine* v. *Piper,* 22 Pick. 85.   If then we find that Moses Green, at his decease, was seised of the upland at Salter's, there being no suggestion that either upland or flats had ever been alienated the one without the other, it follows that the flats were owned by him.

It was suggested, in the course of the argument, that as the flats were not specified in the will or noticed in the inventory, it was doubtful whether, if Green owned the flats, they passed by his will.   It is a question of very little importance ; because, in the case supposed, if the flats did not pass by Green's will, they passed by descent to his heirs.   But we think there is no room for any such doubt.   By the residuary clause, he gives " all his estate, real and personal," to his wife for life, with remainder to three children.   This clearly carries the flats.   In the inventory, they may be included under the term homestead ; but if not, it would make no difference.   A mistake on the part of executors or appraisers, in omitting real estate which ought to be included, would not prevent the operation of the will devising it.   The estate in the flats did therefore vest in the residuary devisees.

Whether the deeds of the two surviving devisees to the plain-tiffs would carry the whole, we give no opinion; the point was not raised nor argued.

1. We come now to the points relied on by the defendant. The one apparently most relied on in the elaborate written argument of the defendant is this. The defendant insists that the court ruled erroneously as to the effect and construction to be given the plaintiffs' two deeds. Both deeds are from the same grantors to the same grantees, bearing the same date, acknowledged before the same magistrate, and recorded at the same time. The one, a deed of the upland bounding on Salter's Cove, Bass River and Porter's River; the other, a quitclaim deed for a valuable consideration—$300—containing the usual words " grant, remise, release, and forever quitclaim " all right to the flats and muscle bed adjoining, with the qualified covenant of warranty used in that form of deed, *habendum*, &c., " so that neither we, nor our heirs, or any person claiming by, from, or under us shall " &c.

That these words constitute a qualified warranty, see *Trull* v. *Eastman*, 3 Met. 121, and *Newcomb* v. *Presbrey*, 8 Met. 406.

That a quitclaim deed in this form, for a valuable consideration, with words of grant, is valid to convey all the right and title which the grantor has, is a rule too familiar to require authorities to support it.

Two deeds made at the same date, between the same parties, and relating to the same subject, are to be construed together as one transaction. *Clap* v. *Draper*, 4 Mass. 266. *King* v. *King*, 7 Mass. 496.

To the introduction of these deeds the defendant objected, on the ground that they were inconsistent with each other; that from the conduct of the parties resulted a strong implication that no flats passed under the warranty deed, as appurtenant to or parcel of the upland, by the ordinance of 1647; that the giving of the quitclaim deed repelled all legal presumption that any flats did so pass; that the giving and accepting of this deed was more than a mere superfluous act, and operated as a waiver or estoppel on the plaintiffs, precluding them from set-

ting up title to the flats and muscle bed, as attached to the upland. The court ruled that the giving and accepting of these deeds did not preclude or estop the plaintiffs from setting up their title and possession, so as to support this action.

We cannot perceive how the court could have possibly ruled otherwise; nor upon what ground the supposed estoppel, waiver or severance rests. The first deed, according to the ordinary rules of construction, being of upland bounding upon creeks and coves, where the tide water ebbs and flows, would have passed the flats as parcel, but for the simultaneous deed. But construing the two together, according to the rule above stated, it may be fairly inferred that it was the intent of the parties that the flats should not pass by the first deed. But the only reason why the flats did not pass by the first deed is, that it was the intent of the parties that they should pass by the second deed. And why should they not? We have been unable to perceive any repugnancy or inconsistency. Suppose the two parcels, described just as they are in the two deeds, had been embraced in one deed, with a general warranty, after the habendum, of one parcel, and a qualified warranty as to the second parcel, would not the whole have passed? Then where do we find any severance? A severance may be effected where one having land, and flats belonging thereto, conveys the one, reserving the other, or conveys the one to one grantee, and the other to another. Then the respective parcels vest in different parties, and of course are severed. But here they were conveyed *uno flatu* to the same grantees, by deeds operating together and construed as one, and consequently there was no severance. But if it could in any wise be construed a severance in the hands of the same grantees, still the flats passed, the plaintiffs became thereby owners of the flats, the right of possession followed the right of property, and the plaintiffs could maintain an action of trespass for any violence done to such possession.

It appears manifest, we think, that the object and purpose of giving two deeds was this: That, as to the upland, the grantors had no doubt of their title, and were content to bind themselves by a general warranty for good title against every body; but

flats being a peculiar species of real estate, both as to its tenure and boundaries, the grantors were willing to convey all their right and title, but not to bind themselves beyond their own acts and those who might claim under them. And we do not see why these objects were not well and legally accomplished by the mode adopted.

It is stated in the report that the plaintiffs relied upon actual possession and occupation of the premises, exclusive of the right acquired by said deeds; and thereupon the court instructed the jury, that if the plaintiffs had proved an actual and exclusive occupation of the upland, and of the place where the trespass was alleged to have been committed, and that the place was between the upland and the channel, above low water mark, and within one hundred rods, it would be sufficient to enable the plaintiffs to recover.

This direction was certainly correct. It is said there was no evidence of any such actual possession; and if there was not, the direction was simply immaterial. We do not perceive the ground of the remark of the judge, that the defendant could use the fact of the two deeds being given in this manner as matter of evidence, and comment to the jury on the question of possession. But it could not be injurious to the defendant, and is therefore no cause of exception on his part.

2. The next ground of exception is this: It was contended by the defendant, that a part of that portion of the flats called the muscle bank was so situated that, if straight lines were properly drawn from the upland at Salter's Point, they would strike a bend in the deep channel from which the tide never ebbs, and, to reach parts of the muscle bed in question, the lines must cross such channel. The case however finds, that lines properly drawn from the upland at Salter's would reach and include within one hundred rods the part of the muscle bank where the trespass was committed. Upon this point, the court expressed an opinion that, under the circumstances of the case, there being no claim or conflicting right of any conterminous proprietor, the intervention of a bend in the channel would not defeat the claim of the plaintiffs to so much of said bank as

came within the one hundred rods, and was on the same side of the channel with the upland to which it is claimed to be appurtenant; but that, as the channel did not so intervene between the plaintiffs' upland and the place on the muscle bank where the trespass was committed, the point was immaterial.

Of the correctness of the former part of that opinion, we certainly entertain great doubt. The fact, that it was not within the private right of any conterminous proprietor, it appears to us, has no effect; if it was not within the right of any other proprietor, and was not within that of the plaintiffs, because beyond low water mark, as correctly measured, then it was part of the public domain. Of this however we give no positive opinion, because it is not necessary to the decision of this cause; and, should the question arise again, perhaps a more accurate measurement, upon the principles on which the rights of ownership of flats are determined, may show a different state of facts, and present the question in a different aspect. But the latter part of the opinion is strictly correct, and renders the former immaterial. It is found that the place of the trespass was within the plaintiffs' private right to flats. And, in an action of trespass *quare clausum*, proof of a trespass in any part of the close described is sufficient to maintain the action.

Several other points were made and argued, which we have considered, but do not think of sufficient importance to be stated at length.

Some evidence having been offered to prove digging on the flats from thirty to fifty years ago, and so occasionally at a later period, for the purpose of establishing a common right by usage, the judge left the fact to the jury, with a remark that the evidence seemed to be somewhat slight for the establishment of so extensive a claim. We think this remark was well warranted by the state of the evidence, and did not encroach on the rights of the jury, or go beyond a fair commentary upon the nature and application of the evidence to the matter in issue.

Some evidence was offered from ancient records, to show that in running the boundary line between Salem and Beverly in 1659 the east side of Naumkeag River was the boundary, and

38 *

so the flats in question lay within the limits of Salem; from which the defendant would infer that the inhabitants of Salem retained a right, either exclusive or in common, to the flats, which would have otherwise belonged to estates in Beverly by force of the ordinance of 1647. We have not inquired particularly whether the thread of the river or the east bank was the true boundary, because, in our judgment, it is wholly immaterial. This fixing of town lines merely determined the limits of municipal jurisdiction. It neither conferred any right of property nor restrained any such right. A man might well own upland in one town, and the flats appurtenant, although in another town. Rights, either private rights of property or common rights, depended on other considerations.    *Exceptions overruled.*

*D. Roberts*, for the defendant.

*S. B. Ives, Jr. & J. B. Peabody*, for the plaintiffs.